No. 26-1222

In the United States Court of Appeals
for the Sixth Circuit

# United States of America

Plaintiff - Appellee,

v.

# David Taylor

Defendant - Appellant

On Appeal from the United States District Court
for the Eastern District of Michigan
No. 25-cr-20560 (Hon. Terrence George Berg)

## Brief for the United States

Jerome F. Gorgon Jr.
United States Attorney

Daniel D. Shin
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9516
Daniel.Shin@usdoj.gov

# Table of Contents

Table of Authorities.................................................................................... iii

Oral Argument Is Unnecessary ...................................................................v

Issues Presented........................................................................................1

Statement of the Case ...............................................................................2

    A.    As leader of the Kingdom of God Global Church, Taylor uses force, psychological abuse, and threats to profit from the coerced labor of his victim-followers. ......................................2

    B.    Taylor solicits sexually explicit materials from female members. .....................................................................................6

    C.    Citing his dangerousness, a federal magistrate judge orders Taylor detained pending trial. ..............................................7

    D.    The district court denies Taylor's motion to revoke the detention order. ......................................................................7

    E.    The district court denies what it construes as Taylor's motion to reopen the detention proceedings........................10

Summary of the Argument ......................................................................15

Argument.................................................................................................16

I.    Taylor's brief only challenges the October 2025 denial of his motion to revoke the detention order, which he did not timely appeal. ...................................................................16

II.    Taylor abandoned any argument about the February 2026 order denying the motion to reopen.............................................20

III.    On the merits, the district court properly denied Taylor's motion to revoke the detention order given evidence of his dangerousness. ...................................................................21

A. This prosecution and Taylor's detention are based on his manipulative and abusive criminal conduct, not improper theological judgments. ...........................................................21

B. No condition or combination of conditions could reasonably assure the safety of any other person and the community. .22

    1. The nature and circumstances of Taylor's coercive and violent offenses show that he is dangerous and requires detention. ......................................................22

    2. The weight of the evidence of Taylor's dangerousness is strong. ...............................................................23

    3. Taylor's history and characteristics also support detention, despite his community ties. ........................25

    4. The nature and seriousness of the danger Taylor poses to any person or the community requires detention. ..................................................................26

Conclusion ..................................................................................28

Certificate of Compliance with Rule 32(a) .............................29

Certificate of Service ...............................................................30

Relevant District Court Documents ........................................31

# Table of Authorities

**<u>Cases</u>**

*Blackwell v. Nocerini,*
  123 F.4th 479 (6th Cir. 2024) ................................................. 17, 19, 20

*Cantwell v. State of Connecticut,*
  310 U.S. 296 (1940) ..................................................................... 21

*Miller v. Wm. Beaumont Hosp.,*
  121 F.4th 556 (6th Cir. 2024) ................................................. 17, 18, 19

*Robinson v. Jones,*
  142 F.3d 905 (6th Cir. 1998) ...................................................... 20

*United States v. Bell,*
  No. 17-cr-20183, 2020 U.S. Dist. LEXIS 58850
  (E.D. Mich. Apr. 3, 2020) ........................................................... 23

*United States v. Dieter,*
  429 U.S. 6 (1976) ....................................................................... 17

*United States v. Dotz,*
  455 F.3d 644 (6th Cir. 2006) ...................................................... 19

*United States v. Greene,*
  892 F.2d 453 (6th Cir. 1989) ...................................................... 21

*United States v. Healy,*
  376 U.S. 75 (1964) ..................................................................... 17

*United States v. Ibarra,*
  502 U.S. 1 (1991) ....................................................................... 20

*United States v. Naser,*
  2025 U.S. App. LEXIS 10008 (6th Cir. Apr. 25, 2025) ....................... 24

*United States v. Salerno,*
  481 U.S. 739 (1987) ................................................................ 17, 19

*United States v. Stone,*
   608 F.3d 939 (6th Cir. 2010) ................................................................21

*United States v. Walls,*
   784 F.3d 543 (9th Cir. 2015) ...............................................................23

**<u>Statutes</u>**

18 U.S.C. § 1589 ......................................................................................2

18 U.S.C. § 1594(b) ..................................................................................2

18 U.S.C. § 1956(h) ..................................................................................2

18 U.S.C. § 3142(f)(2) ............................................................. 12, 17, 18, 19

18 U.S.C. § 3142(f)(2)(B) .................................................................. 11, 13

18 U.S.C. § 3145(b) .................................................................................16

18 U.S.C. § 3145(c) ............................................................... 11, 16, 17, 19

18 U.S.C. § 3156(a)(4) ............................................................................23

28 U.S.C. § 1291 .............................................................................. 16, 19

**<u>Rules</u>**

Fed. R. App. P. 4(a) .................................................................................18

Fed. R. App. P. 4(b) ......................................................................... 18, 20

Fed. R. App. P. 4(b)(3) ...........................................................................17

Fed. R. Civ. P. 59(e) ........................................................................ 16, 18

Fed. R. Civ. P. 60(b) ........................................................................ 16, 17

E.D. Mich. Local R. 7.1(h) ................................... 11, 13, 15, 16, 18, 19

E.D. Mich. Local R. 7.1(h)(1) ...................................................... 16, 18, 19

E.D. Mich. Local R. 7.1(h)(2) .............................................................. 16, 19

## Oral Argument Is Unnecessary

In his opening brief, Taylor challenges only the district court's October 2025 order denying his motion to revoke the detention order, which he did not timely appeal. Were this Court to reach the merits of his detention, however, the issue is not complex and has been sufficiently briefed. Oral argument is therefore unnecessary.

## Issues Presented

I.       Is Taylor's appeal from the October 2025 order denying his motion to revoke the detention order untimely, requiring dismissal?

II.      Has Taylor waived his right to appeal the February 2026 order denying his motion to reopen the detention hearing—the only order he timely appealed—by abandoning any challenge to it?

III.    If considered at all, should the order denying Taylor's motion to revoke the detention order be affirmed because Taylor poses a danger to the community based on his coercive, predatory, and violent criminal conduct committed against his victim-followers?

## Statement of the Case

A federal grand jury in Detroit indicted Taylor and his co-defendant, Michelle Brannon, on one count of conspiracy to commit forced labor in violation of 18 U.S.C. § 1594(b); six counts of forced labor in violation of 18 U.S.C. § 1589; and one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h). (R.1: Indictment, 1–17). Taylor was charged with two more counts of forced labor. (*Id.*). A superseding indictment later added co-defendant Kathleen Klein, but due to its timing, Klein's role was not considered during the detention proceedings. (R.91: Superseding Indictment, 958–77).

**A.** **As leader of the Kingdom of God Global Church, Taylor uses force, psychological abuse, and threats to profit from the coerced labor of his victim-followers.**

These charges arise from Taylor's and Brannon's roles in the Kingdom of God Global Church (KOGGC), formerly Joshua Media Ministries International (JMMI). (R.91: Superseding Indictment, 958–61; R.47: Detention Memo, 234). Taylor leads the organization. (R.91: Superseding Indictment, 958; R.47: Detention Memo, 234). Brannon is the executive director and second-in-command. (*Id.*). Together, since 2013, they compelled the labor of individuals who joined their

organization with physical and psychological abuse such as sleep deprivation, food restrictions, physical assaults, humiliation, and threats of spiritual damnation in the form of sickness, accidents, death, and eternal damnation. (R.47: Detention Memo, 234).

Until their arrests, Taylor and Brannon operated call centers that offered prayer and dream interpretation and solicited donations at various locations, including Michigan, Missouri, Florida, and Texas. (R.47: Detention Memo, 236; R.91: Superseding Indictment, 958–77). Call centers, staffed by KOGGC workers, were the main source of KOGGC's revenue. (R.47: Detention Memo, 236). Some of the male workers served as Taylor's servants, known as "armor bearers," fulfilling his demands around the clock. (*Id.* at 236–37). Taylor and Brannon controlled every aspect of the workers' lives. (R.47: Detention Memo, 238; R.91: Superseding Indictment, 958–77). They physically and mentally weakened the workers by subjecting them to daily public humiliation and psychological abuse and imposing excruciating hours—sometimes more than 20 hours per day. (R.47: Detention Memo, 238–39). They housed the workers in cramped quarters without privacy or adequate bedding, sometimes withholding

food and medical care. (*Id.*). Taylor and Brannon controlled where and when the workers slept, when and what they ate, what they wore, how they spoke, and when they could go to the bathroom. (*Id.* at 239). They insisted that workers give up outside employment, making them wholly reliant on KOGGC for food and shelter. (*Id.*). Taylor and Brannon created a climate of fear that caused the workers to fear serious harm if they made a mistake, complained, did not meet monetary quotas, or left KOGGC. (*Id.* at 240).

First, they used physical violence to intimidate and control. Specifically, they sometimes assaulted workers when their actions or behaviors were not consistent with the rules. (*Id.*). While much of the physical abuse was directed towards men, women witnessed and heard about the assaults and feared assault as a possible consequence. (*Id.*).

Second, Taylor and Brannon used sleep deprivation and withholding of food for failure to meet monetary quotas, as additional means of instilling a climate of fear. (*Id.*).

Third, Taylor and Brannon frequently "rebuk[ed]" workers when they did not follow a rule or meet their expectations. (*Id.*). Rebuking involved yelling at workers, demanding that they get on their knees and

repent, and reminding them of the ultimate consequence of non-compliance: eternal damnation. (*Id.* at 240–41). Taylor and Brannon issued many of these punishments in front of the entire staff as a warning to others. (*Id.* at 241). These rebukes were both humiliating and terrifying. (*Id.*). The rebukings were sometimes coupled with the threat of being "put out" into a garage or a homeless shelter or even being forced to sleep on the street overnight. (R.47: Detention Memo, 241; R.69: Gov. Opposition, 581).

In 2020, Taylor stopped living at the call centers and began exclusively communicating by phone with KOGGC workers. (R.47: Detention Memo, 242). Taylor entrusted Brannon to carry out his orders and punishments. (*Id.*). Taylor and Brannon frequently communicated by text. (*Id.*). Some of the violent, abusive, and controlling messages are included in the first superseding indictment. (R.91: Superseding Indictment, 965–75; R.47: Detention Memo, 242–50).

Multiple minor children of KOGGC workers lived in the call centers or in other KOGGC properties. (R.47: Detention Memo, 252). Two minors who were interviewed corroborated aspects of the forced

labor scheme (including physical assaults) and reported their own emotional, psychological, and sometimes physical abuse and trauma during their involvement in KOGGC. (*Id.*).

In addition, Taylor has encouraged his workers to commit violence against law enforcement. (*Id.* at 273–74). During a meeting with workers, Taylor stated, "God will kill officials" and "like I told you the other day, they gonna be in here with their FBI jackets on . . . You don't scare me. God's gonna to get you. And I am going to make sure he do, too. I am going to make sure I speed it up." (*Id.* at 274).

### B. Taylor solicits sexually explicit materials from female members.

Taylor solicited thousands of sexually explicit photos and videos from female KOGGC workers. (R.47: Detention Memo, 251; R.113: Tr., 1132–33). One example is an explicit masturbation video sent to Taylor by a female worker in which she cries and apologizes for the "delay" in completing the "assignment" and states that she "understand[s] that [she] need[s] to do this and can't delay." (R.47: Detention Memo, 251). Some female members felt that they had no choice but to comply with Taylor's requests and feared disobeying him. (R.62: Tr., 408–09). Indeed, when a former female worker had spoken out against Taylor

and KOGGC, Taylor threatened her: "My staff will show every nude picture and your drug habit. You want to do this publicly, we will. Your enemies and everything – and everyone will see everything. I don't care." (*Id.* at 459).

## C. Citing his dangerousness, a federal magistrate judge orders Taylor detained pending trial.

Two months after Taylor consented to detention in North Carolina, a detention hearing was held in October 2025 in the Eastern District of Michigan. (R.67: Tr., 519). The magistrate judge emphasized that Taylor presented a danger to the community given the "very concerning" and "very disturbing" allegations in the case. (*Id.* at 562). Although the magistrate judge acknowledged his community ties and lack of criminal history, the "horrific" nature and circumstances of the charged crimes loomed larger. (*Id.* at 561).

## D. The district court denies Taylor's motion to revoke the detention order.

Taylor then moved the district court to revoke the detention order. (R.53: Motion to Revoke, 303; R.57: Memorandum in Support of Release, 314). During the hearing, the government reiterated Taylor's

use of physical force and deprivation of sleep, medical care, and food, and demands for sexual images and videos. (R.62: Tr, 402–09).

Addressing Taylor's sexual relations with multiple women and Taylor's solicitation of sexual photographs, Taylor's counsel stated Taylor was "seeking counseling . . . with a Christian minister" and "already seeing a counselor." (*Id.* at 453–54, 460).

The court began by recognizing that the nature and circumstances of the charged offenses were "extremely serious because the allegations in the indictment are quite specific with regard to a number of victims who . . . were subject to forced labor during the time when they were working for Mr. Taylor in this enterprise." (*Id.* at 468–69). The court was careful to distinguish "conduct that's charged as criminal . . . from religion and faith" and made clear that Taylor is charged "with specific acts of conduct, and in particular, forcing the labor of . . . eight different individuals." (*Id.* at 469).

The court further examined the coercive and violent instructions and threats that Taylor sent to Brannon by text, noting that he threatened deprivation of sleep, food, and shelter. (*Id.* at 469–70). The court discussed the "threatening, abusive language indicating that if

certain goals are not met, individuals will be made to go to a shelter, will be made to go to a garage, will have to stay up until 4:00 a.m. and then get up at 8:00 a.m. and have water thrown on them in order to wake them up." (*Id.* at 470). The court reiterated that "this is conduct" and "has nothing to do with the faith of those who followed Mr. Taylor." (*Id.*). The court interpreted Taylor's statements as "attempt[s] to coerce people to raise funds at all hours." (*Id.* at 471).

The court found that the weight of Taylor's danger to the community is "quite significant." (*Id.* at 474). Taylor engaged in "repeated conduct involving the intimidation and the control and the coercion of individuals, and . . . this was conducted through specific kinds of acts such as the deprivation of food, the deprivation of sleep, and even the deprivation of shelter." (*Id.*). Further, Taylor "was engaging in sexual relationships with individuals from within the church and then obtaining images of them." (*Id.* at 475). The court further noted the possibility of disclosure of these images by Taylor or individuals associated with him. (*Id.* at 475–76).

The court acknowledged that ties to a church community and employment within that church would ordinarily be positive factors

favoring release, but it had to consider those ties in the context of Taylor running the "enterprise" in a way "that was harming people." (*Id.* at 479).

Finally, the court considered the nature and seriousness of Taylor's danger to the community. Given the "pattern of abusive conduct, manipulative conduct, in some cases violent conduct and coercive conduct," it "[could not] see how there can be any conditions that would separate Mr. Taylor from the entity that engaged in all that kind of conduct and resulted in these charges." (*Id.* at 479–80).

The court ordered Taylor detained pending trial, finding that Taylor would be a danger to the community if released. (*Id.* at 481). Taylor did not file a notice of appeal within 14 days.

### E. The district court denies what it construes as Taylor's motion to reopen the detention proceedings.

Instead of appealing, Taylor moved for reconsideration, arguing that the government's proffer was insufficient and that other evidence disproved the allegations. (R.64: Motion to Reconsider, 492–511; R.71: Reply, 604–16). The government responded that reconsideration was an improper method to seek review. (R.69: Gov. Opposition, 571–73, 588 n.6). Taylor's detention order was a final, appealable order by statute,

and Local Rule 7.1(h)(1) forbids motions for reconsideration of final orders. (*Id.* at 588 n.6; 18 U.S.C. § 3145(c)). The Bail Reform Act—not the local rule—set forth the procedure for challenging a detention order. (R.69: Gov. Opposition, 588 n.6). After the court denied his motion to revoke, Taylor had two options: (1) directly appeal under § 3145(c); or (2) move to reopen his detention hearing under § 3142(f)(2)(B). (*Id.* at 572–73). But even construing his motion as seeking reopening, Taylor failed to present any new evidence. (*Id.* at 572–88 (citing 18 U.S.C. § 3142(f)(2)(B)).

The court agreed that the Bail Reform Act—not Local Rule 7.1(h)—set out the only process by which Taylor could reopen his detention proceeding. (R.113: Tr., 1099–1100). The remainder of the hearing focused on Taylor's claim that discovery provided by the government, including victim interviews and texts from Taylor, were exculpatory.

The government argued that Taylor's own text messages were not new—they were known and available to him all along. (*Id.* at 1118). Moreover, the government read excerpts of some of the victim

interviews to rebut Taylor's argument that information previously proffered by the government was taken out of context. (*Id.* at 1125–28).

The government also read texts that Taylor sent to himself on his phone (akin to a diary) in 2025:

- "Physical abuse to my wife. Condemning people to death and hell. Beating staff. Things in my character getting worse. Sleep with women in the office. . . . I get angry quickly and easily. I have a temper. Hitler character. Comfort doesn't create success, pressure does." (*Id.* at 1132, 1135–36).

- "This impatience develops also a mean-spirited personality in you from being hard or harsh on people. . . . My personal struggle with lust. I must overcome the lust of the eyes for beautiful women or the things my eyes look – love to look at on a woman." (*Id.*).

At the court's request, the government filed the victim interviews under seal. (*Id.* at 1142–43, 1149, 1151; R.82: FBI Reports (under seal)).

On February 13, 2026, the district court denied Taylor's motion. (R.108: Order, 1029). The court clarified that Taylor incorrectly sought reconsideration, when the appropriate procedure was to seek reopening of his detention hearing under the Bail Reform Act. (*Id.* at 1034). The court treated Taylor's request as seeking reopening under § 3142(f)(2) and analyzed whether new information existed and, if so, whether it

12

had a material bearing on detention. (*Id.* at 1034–35, 1038). Neither prong was met.

First, "[t]he bulk of Taylor's motion is backward-looking; it seeks to re-fight the battle of the previous hearings and argues that '[t]he Government's proffer was wholly insufficient.'" (*Id.* at 1039). Taylor did not present new information as required under § 3142(f)(2)(B), and Taylor could not use that provision to relitigate the initial detention hearing. (*Id.*).

Second, the purportedly new evidence was neither new nor helpful to his quest for release. (*Id.* at 1041–44). Instead, the court's review of the victim interviews left it "with an even greater concern than before that releasing Taylor would represent a danger to the community and to witnesses" because they "support" rather than "undermine" his dangerousness. (*Id.* at 1046).

The court denied his motion. It further noted that even if Taylor could have sought reconsideration under Local Rule 7.1(h), he would not have succeeded. (*Id.* at 1047–49).

Taylor filed a notice of appeal thirteen days later. (R.114: Notice of Appeal, 1157). The notice stated that he appealed from both the October

2025 order denying his motion to revoke detention and the February

2026 order denying his "motion for reconsideration of that order." (*Id.*).

## Summary of the Argument

Taylor's appeal suffers from two fatal procedural errors that require its dismissal. First, his opening brief challenges only the merits of the October 2025 order denying his motion to revoke the detention order. But he did not timely appeal from that order. Instead, he filed an improperly-styled "motion for reconsideration" under Local Rule 7.1(h), which prohibits reconsideration of final orders. Because this motion was improper, it did not extend his 14-day appeal window. Thus, Taylor's notice of appeal was several months late as to the earlier order. Second, although Taylor timely appealed from the February 2026 order denying the motion to reopen the detention hearing, he waived that issue by failing to address it in his opening brief.

If this Court reaches the merits, the district court rightly denied Taylor's motion to revoke detention. The record evinces Taylor's coercive and abusive conduct, and the court did not clearly err in distinguishing conduct from religious beliefs. Based on that conduct, the court correctly found that Taylor is a danger to the community and must remain detained pending trial. Short of dismissal, this Court should affirm.

## Argument

**I. Taylor's brief only challenges the October 2025 denial of his motion to revoke the detention order, which he did not timely appeal.**

Taylor's appeal of the October 2025 order denying his motion to revoke the detention order—the only order he substantively challenges in his opening brief—should be dismissed as untimely.

The Bail Reform Act sets forth the procedures a defendant must follow to seek review of a magistrate judge's detention order. First, he must move the district court to revoke it. 18 U.S.C. § 3145(b). If the district court denies the motion to revoke, he must seek further review by appealing to the appellate court. 18 U.S.C. § 3145(c). The denial of a motion to revoke is, by statute, a final, appealable order under 28 U.S.C. § 1291 that must be "determined promptly." *Id.*

Separately, Eastern District of Michigan Local Rule 7.1(h) establishes procedures for seeking reconsideration of both "final" and "non-final" district court orders. Local Rule 7.1(h)(1) requires parties seeking reconsideration of "final orders or judgments" to move under Federal Rule of Civil Procedure 59(e) or 60(b); the "court will not grant reconsideration" of final orders. Local Rule 7.2(h)(2) sets out the

16

standard for seeking reconsideration of "non-final orders," which are "disfavored." Like the motions specified in Federal Rule of Appellate Procedure 4(b)(3), proper motions for reconsideration render "the original judgment nonfinal for purposes of appeal for as long as the petition is pending." *United States v. Dieter*, 429 U.S. 6, 8 (1976) (per curiam) (citing *United States v. Healy*, 376 U.S. 75, 78–79 (1964)).

But the time to appeal is not extended for a motion, like Taylor's, *improperly* styled as a motion for reconsideration. *Blackwell v. Nocerini*, 123 F.4th 479, 486 (6th Cir. 2024); *see also Miller v. Wm. Beaumont Hosp.*, 121 F.4th 556 (6th Cir. 2024). First, as the district court found, the Bail Reform Act—not the local rule—establishes the procedures for seeking review of a detention order, which is a final, appealable order that must reviewed "promptly." (R.108: Order, 1034 n.1); 18 U.S.C. §§ 3142(f)(2), 3145(c); *United States v. Salerno*, 481 U.S. 739, 752 (1987) (the Bail Reform Act's "review provision[], § 3145(c), provide[s] for immediate appellate review of the detention decision"). And second, the local rule does not allow reconsideration of "final" orders like the denial of a motion to revoke. The district court rightly found that Taylor's motion for reconsideration was improper. (R.108: Order, 1034 n.1).

17

Nevertheless, the district court construed his motion as seeking reopening of the detention hearing under § 3142(f)(2) and denied relief. (*Id.* at 1034–35 & n.1, 1036–47).

On February 26, 2026, Taylor filed his notice of appeal—both from the October 2025 order denying his motion to revoke and from the February 2026 order denying his motion to reopen. But Taylor's appeal of the October order was over three months late. His December motion, properly construed as a motion to reopen, did not extend the 14-day window to appeal. Fed. R. App. P. 4(b). And that October order is the only order he challenges in his opening brief. This Court must dismiss Taylor's appeal of the October order denying revocation as untimely. *Miller v. William Beaumont Hospital*, 121 F.4th 556 (6th Cir. 2024), is instructive. There, within the 30-day window to file a notice of appeal in a civil case, Miller sought reconsideration under Eastern District of Michigan Local Rule 7.1(h) of an order granting summary judgment. *Id.* at 557; Fed. R. App. P. 4(a). By the time the district court denied the motion due to Miller's failure to invoke Rules 59(e) or 60(b) as Local Rule 7.1(h)(1) requires, the 30-day appeal deadline had passed. *Miller*, 121 F.4th at 557–58. And the improperly-styled "motion for

18

reconsideration did not alter the thirty-day notice-of-appeal deadline."

*Id.* at 558. This Court therefore dismissed the appeal of the summary-judgment order as untimely. *Id.*; *see also United States v. Dotz*, 455 F.3d 644, 648 (6th Cir. 2006) (dismissing appeal as untimely because Rule 35 motion did not extend the deadline to appeal).

The same reasoning supports dismissal here. Under the Bail Reform Act, Taylor had two options after the district court denied his motion to revoke: (1) appeal that order within 14 days under § 3145(c); or (2) request reopening under § 3142(f)(2). Taylor did neither and instead moved improperly for reconsideration under Local Rule 7.1(h).[1]

---

[1] An order denying a motion to revoke is a "final" appealable order under 28 U.S.C. § 1291, and the resulting appeal must be "determined promptly." 18 U.S.C. § 3145(c). This language highlights why a motion for reconsideration of a "non-final" order under Local Rule 7.1(h)(2) is improper in the time-sensitive context of a denial of a motion to revoke, which effectively ends the detention proceeding. *Cf. Blackwell*, 123 F.4th at 486 (holding that the word "final" in Local Rule 7.1(h) is "consistent with its ordinary meaning to cover only an order completing a case"). And reconsideration of a final order—like the order denying revocation—is not allowed under Local Rule 7.1(h)(1). The order in *Blackwell*—the denial of a motion to dismiss based on qualified immunity in a civil case—is distinguishable from the order here, which is governed by the Bail Reform Act, ends the detention proceedings (unless new information comes to light), and requires "prompt" review. 18 U.S.C. § 3145(c); *Salerno*, 481 U.S. at 752 (the Bail Reform Act calls for "immediate appellate review of the detention decision").

Recognizing as much, the district court treated it as a motion to reopen and Taylor argued for reopening at the hearing. But that motion to reopen did not extend Taylor's deadline to appeal the detention decision under Federal Rule App. P. 4(b), as a "properly filed" reconsideration motion would. *See Blackwell*, 123 F.4th at 486; *United States v. Ibarra*, 502 U.S. 1, 6–7 (1991) (per curiam).

## II. Taylor abandoned any argument about the February 2026 order denying the motion to reopen.

While Taylor's notice of appeal was timely as to the February 2026 order declining to reopen the detention hearing, that challenge suffers from its own fatal flaw: Taylor abandoned it on appeal. Arguments that are not specifically raised on appeal are considered abandoned and are not reviewable. *See, e.g.*, *Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998). And like his repeated choice to ignore the reopening standard in his district-court briefing, he also skips it here and focuses only on the merits of the original detention order. (Taylor Br., 9 (issue statement challenging order of detention only); 35 (conclusion seeking only reversal of detention order)).

**III. On the merits, the district court properly denied Taylor's motion to revoke the detention order given evidence of his dangerousness.**

If the Court reaches the merits of Taylor's detention order, Taylor is rightly detained based on his uniquely coercive and abusive conduct. This Court reviews the district court's factual findings for clear error, but it considers mixed questions of law and fact—including the ultimate question whether detention is warranted—de novo. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).

**A. This prosecution and Taylor's detention are based on his manipulative and abusive criminal conduct, not improper theological judgments.**

Perhaps hoping to obfuscate the overwhelming evidence of his dangerousness, including his physical and sexual abuse and exploitation of his victim-followers, Taylor spends much of his brief discussing the First Amendment. (Taylor Br., 21–27). But "[i]t is well established that the absolute constitutional protection afforded freedom of religious belief does not extend without qualification or limitation to religious conduct." *United States v. Greene*, 892 F.2d 453, 456 (6th Cir. 1989); *see also Cantwell v. State of Connecticut*, 310 U.S. 296, 303–04 (1940) (explaining that the First Amendment "embraces two concepts— freedom to believe and freedom to act. The first is absolute but . . . the

second cannot be. Conduct remains subject to regulation for the protection of society."). As the district court took care to explain, Taylor's *conduct*—not his beliefs or his followers' beliefs—is the focus. (R.62: Tr., 469 (noting the important distinction between "how the law treats criminal conduct . . . and . . . religion and faith"); *id.* at 470 ("[T]his is conduct.").

Taylor sidesteps the critical point that the evidence establishes: his victims did not voluntarily subject themselves to his abuse, coercion, physical assaults, and sexual exploitation. The First Amendment does not guarantee Taylor continued access to his victims in the name of religion while the case continues.

### B. No condition or combination of conditions could reasonably assure the safety of any other person and the community.

The evidence of Taylor's horrific criminal conduct requires his detention. The district court did not err in finding as much and denying Taylor's motion to revoke the detention order.

### 1. The nature and circumstances of Taylor's coercive and violent offenses show that he is dangerous and requires detention.

The district court rightly found that the nature and circumstances of Taylor's offenses require his detention. Forced labor offenses are

crimes of violence under the Bail Reform Act that carry a presumption of detention. 18 U.S.C. § 3156(a)(4). "By definition, human trafficking is a violent, fraudulent, and coercive crime." *United States v. Bell*, No. 17-cr-20183, 2020 U.S. Dist. LEXIS 58850, at *11–12 (E.D. Mich. Apr. 3, 2020) (denying defendant's motion for pretrial release in a case involving a human trafficking and drug distribution conspiracy); *see also United States v. Walls*, 784 F.3d 543, 548 (9th Cir. 2015) ("Congress [has] recognized that human trafficking . . . 'is a modern form of slavery, and it is the largest manifestation of slavery today.'").

Taylor's conduct demonstrates his dangerousness. He obtained the unpaid labor of his victims through force, threats of force, and coercion. And Taylor's violent and abusive threats evidence his criminal intent "to coerce people to raise funds at all hours." (R.62: Tr., 471). And Taylor profited handsomely from his scheme. These serious circumstances favor detention. (*Id.* at 467–72).

### 2. The weight of the evidence of Taylor's dangerousness is strong.

The next factor "goes to the weight of the evidence of dangerousness or risk of flight, not the weight of the evidence of the

23

defendant's guilt." *United States v. Naser*, 2025 U.S. App. LEXIS 10008, at *5 (6th Cir. Apr. 25, 2025) (quotation omitted).

Contrary to Taylor's claims on appeal, the evidence of his dangerousness was not "vague" or "uncontextualized." The record is replete with specific examples of Taylor's threatening, coercive, and abusive text messages and memos. (R.62: Tr., 474). The court found that "these statements are attempting to coerce people, there's no other way of looking at it." (*Id.* at 470–71). That finding was not clearly erroneous.

Second, Taylor's orders that others physically assault his victim-followers demonstrate his dangerousness. The court heard that Taylor and co-conspirators used physical violence to intimidate and control; for example, men were punched in the face or shoved. (*Id.* at 402). The court accepted that Taylor (or others acting at his behest) "engaged in violent activities against some of the members of this organization, whether by hitting them, pushing them, physically removing them from one place to another or otherwise using force, physical force against other people." (*Id.* at 477). The court properly credited this evidence when it found that Taylor is dangerous. And when the court thoroughly

reviewed all the victim interviews documenting Taylor's abuse and violence, it was left "with an even greater concern than before that releasing Taylor would represent a danger to the community and to witnesses." (R.108: Order, 1046). This conclusion was not an error.

Third, Taylor's solicitation of sexual materials from female members demonstrates his dangerousness to his particularly vulnerable victims. Some female victims felt that they had no choice but to comply. (R.62: Tr., 408–09). The court rightly found that "Taylor had coerced some of the female members into sending these . . . explicit sexual images." (R.62: Tr., 476). Taylor's documentation and admission in his phone that he has a "struggle with lust," the representation that Taylor has sought counseling for his sexual "transgressions," and his demonstrated behavior soliciting sexual materials shows his dangerousness. (R.113: Tr., 1135; R.62: Tr., 453, 460).

The district court correctly found that there is strong evidence of Taylor's dangerousness, requiring his detention.

### 3. Taylor's history and characteristics also support detention, despite his community ties.

The district court acknowledged Taylor's age, lack of criminal history, and strong ties to his organization. (R.62: Tr., 477–79). But his

community ties weigh against him here, where the forced labor occurred within his organization. (*Id.* at 478). Therefore, while Taylor may lack criminal history, any ties he may claim to his community must be viewed in the context of the crimes he committed. The district court rightly found that his history and characteristics support detention.

### 4. The nature and seriousness of the danger Taylor poses to any person or the community requires detention.

Taylor's "pattern of abusive conduct, manipulative conduct, in some cases violent conduct and coercive conduct" reflects a clear danger to those who have spoken out against him that cannot be addressed by bond conditions. The district court astutely did not "believe that there's any way to prevent [Taylor] from communicating with the people in that enterprise, to prevent him from communicating threatening messages to witnesses or victims as he did to those women that were mentioned by the government regarding those images, and he has every incentive or motive to try to do so now." (*Id.* at 480).

Taylor's argument that his congregation accepted his violent and controlling methods is both contradicted by the evidence and underscores his special brand of manipulative dangerousness that bond conditions cannot address. (Taylor Br., 14, 19–25). Indeed, the evidence

highlighted Taylor's coercive tactics, which overrode the will of his victims. (R.62: Tr., 480). And as the district court correctly noted, there is a danger of reprisals against those victims and witnesses who have spoken against Taylor, "and he has every incentive or motive to try to do so now." (*Id.*). Taylor proposes bond conditions prohibiting the possession and use of electronic devices, and no-contact orders with former members. (Taylor Br., 32–33). The record shows, however, Taylor often uses others to threaten and punish his victims. (R.47: Detention Memo, 277). And Taylor has threatened law enforcement, too, telling workers that "God will kill officials" and that he would help those "with their FBI jackets on" speed up their meeting with God. (R.47: Detention Memo, 274). Therefore, bond conditions such as electronic device prohibitions and no-contact orders will not address the unique concerns present in this case, where others remain willing to do Taylor's bidding.

The district court rightly found by clear and convincing evidence that no condition or combination of conditions could protect the community or his victims from Taylor. He must remain detained pending trial.

## Conclusion

This appeal should be dismissed, or the district court's order should be affirmed.

<div style="margin-left: 45%;">

Respectfully submitted,

Jerome F. Gorgon Jr.
United States Attorney


/s/ Daniel D. Shin
Daniel D. Shin
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9516
Daniel.Shin@usdoj.gov

</div>

Dated: June 17, 2026

## Certificate of Compliance with Rule 32(a)

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Sixth Circuit Rule 9(a)(4) because, excluding the parts of the brief exempted by Rule 32(f), it contains 5151 words. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Daniel D. Shin
Assistant United States Attorney

Dated: June 17, 2026

# Certificate of Service

I certify that on June 17, 2026, I caused this Brief for the United States to be electronically filed with the Clerk of the United States Court of Appeals for the Sixth Circuit using the ECF system, which will send notification of the filing to the following attorney of record:

Brent Adams Hannafan, brent@litson.co
Allison L. Kriger, allison.kriger@gmail.com
Zachary Carter Lawson, zack@litson.co
Laurence H. Margolis, larry@lawinannarbor.com

/s/ Daniel D. Shin
Assistant United States Attorney

# Relevant District Court Documents

The United States of America designates as relevant these documents in the district court's electronic record, Eastern District of Michigan case number 25-cr-20560:

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 1 | Indictment | 1–23 |
| 47 | Government's Memorandum in Support of Detention | 232–79 |
| 53 | Motion to Revoke Detention Order | 303–06 |
| 62 | 10/21/2025 Transcript of Hearing on Motion to Revoke Detention Order | 395, 402–09, 422, 428, 433, 453–54, 459–60, 468–71, 474–81 |
| 64 | Defendant David Taylor's Motion to Reconsider Order of Detention | 487–512 |
| 67 | 10/17/2025 Transcript of Arraignment / Detention Hearing | 519, 531, 560–62 |
| 69 | Government's Opposition to Defendant's Motion to Reconsider | 568–600 |
| 71 | Reply to Response regarding Motion for Reconsideration of Order of Detention | 604–32 |
| 82 | FBI Reports *(filed under seal)* | |
| 91 | Superseding Indictment | 958–987 |
| 108 | Order Denying Motion to Reconsider Order of Detention | 1029–49 |
| 113 | 12/15/2025 Transcript of Hearing on Motion for Reconsideration of Order of Detention | 1099–1102, 1112–118, 1125–28, 1132–33, |

|  |  | 1135–36, 1142–43, 1149, 1151 |
|---|---|---|
| 114 | Notice of Appeal | 1157–58 |